1

2

3

4

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

5

6

7

8

9

10

11

| | | |
|---|---|---|
| KENNETH HIBBLER, | ) | |
| | ) | 3:11-cv-00067-LRH-VPC |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | **)** | **OF U.S. MAGISTRATE JUDGE** |
| STATE OF NEVADA, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | May 6, 2013 |
| | ) | |

12

13

14

15

16

17

18

19

20

21

22

23

        This Report and Recommendation is made to the Honorable Larry R. Hicks, United States

District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. §

636(b)(1)(B) and LR IB 1-4.  Before the court is plaintiff's motion for summary judgment (#55)[1]

and defendant Rexwinkel's unenumerated 12(b) motion to dismiss, or in the alternative, motion for

summary judgment (#56).  Defendant opposed plaintiff's motion for summary judgment (#61).

Plaintiff did not reply.  Plaintiff opposed defendant's unenumerated 12(b) motion to dismiss, or in

the alternative, motion for summary judgment (#71).  Defendant replied (#72) and plaintiff

responded (#73).  The court has thoroughly reviewed the record and recommends that plaintiff's

motion for summary judgment (#55) be denied, and that defendant Rexwinkel's unenumerated 12(b)

motion to dismiss, or in the alternative, motion for summary judgment (#56) be granted.

24

25

26

27

**I.  HISTORY & PROCEDURAL BACKGROUND**

        Plaintiff Kenneth Hibbler ("plaintiff"), a *pro se* litigant, has been released from prison and

currently resides in Michigan (#36).  However, the allegations set forth in plaintiff's first amended

28

_____

[1] Refers to the court's docket numbers.

-1-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

civil rights complaint pertain to events which occurred while plaintiff was incarcerated at Northern Nevada Correctional Center ("NNCC") in the custody of the Nevada Department of Corrections ("NDOC") (#25).   On August 16, 2011, plaintiff filed his first amended civil rights complaint, pursuant to 42 U.S.C. § 1983, alleging deliberate indifference to his serious medical needs in violation of the Eighth Amendment, and retaliation in violation of the First Amendment (#25).   The court screened the complaint, pursuant to 28 U.S.C. § 1915A, and permitted plaintiff's retaliation claim to proceed against defendant Rexwinkel (#24, p. 5).

Plaintiff alleges that on February 1, 2011, he was summoned to defendant Rexwinkel's office to discuss accusations that he had not been performing his job as a barber (#25, p. 29).   Defendant Rexwinkel fired plaintiff, then falsely reported to a correctional officer that plaintiff had threatened her.  *Id.*   Thereafter, plaintiff was transferred to a different housing unit and found a job as a porter. *Id.*   On February 17, 2011, plaintiff was "arrested" and placed in "the hole" for allegedly threatening defendant Rexwinkel a second time.  *Id.*   Plaintiff remained in "the hole" for six months due to these false accusations, but was eventually cleared of the charges in June 2011.  *Id.* at 30.   Plaintiff contends that "the timing of all this was suspect," i.e., that defendant Rexwinkel fired plaintiff in retaliation for filing the original civil rights complaint in this case.  *Id.*

Defendant Rexwinkel asks the court to grant her unenumerated 12(b) motion to dismiss on the grounds that plaintiff failed to properly exhaust his administrative remedies with respect to his First Amendment retaliation claim (#56, p. 2).   In the alternative, defendant Rexwinkel asks the court to grant her motion for summary judgment because plaintiff cannot demonstrate a link between defendant's alleged retaliatory actions and the exercise of plaintiff's First Amendment activity, nor can plaintiff demonstrate that his First Amendment rights were chilled because of defendant's conduct.  *Id.* at 11.

Defendant Rexwinkel alleges that between February 1, 2011 (the date she fired plaintiff from his job as a barber), and August 16, 2011 (the date plaintiff filed his first amended civil rights complaint), plaintiff submitted eight informal grievances (#56-1, Ex. C, ¶ 7).   Five of these grievances were unrelated to plaintiff's retaliation claim.   Defendant contends that the remaining three grievances were relevant, but not properly exhausted.[2]   *Id.*

*Grievance Log No. 2006-29-17985*

On February 1, 2011, plaintiff filed an informal grievance claiming that defendant Rexwinkel fired plaintiff from his job as a barber and transferred him into a less desirable housing unit, in retaliation for plaintiff filing a lawsuit (#56-1, Ex. D, p. 1).   Plaintiff claimed that after defendant Rexwinkel told him that he was fired, Correctional Officer ("C/O") Coffin walked into the office.  *Id.* at 2.   Defendant Rexwinkel informed C/O Coffin that plaintiff was "irrate [sic] and shouting."  *Id.*  Plaintiff was ordered to leave the office, so he left.  *Id.* at 2-3.   Thereafter, plaintiff spoke to Mrs. Morris, who informed plaintiff that defendant Rexwinkel and C/O Corzine had generated a report, stating that plaintiff shook his finger at defendant Rexwinkel, cussed her out, and leapt behind her desk to threaten her.  *Id.* at 3.

On March 29, 2011, plaintiff filed a first level grievance, complaining that he had not yet received a response to his February 1, 2011, informal grievance.  *Id.* at 5-7.   Plaintiff was permitted to file a first level grievance, pursuant to Administrative Regulation ("AR") 740, because the informal level response was overdue (#56-1, Ex. B, p. 3; #56-1, Ex. D, p. 5).

On May 12, 2011, NDOC officials advised plaintiff that his February 1, 2011, informal grievance was still being researched and that he would receive a response soon (#56-1, Ex. D, p. 8).

---

[2] Grievance Log No. 2006-29-26432 grieved an alleged miscalculation of merit credits and time served (#56-1, Ex. C, ¶ 14).  Grievance Log No. 2006-29-25773 grieved an alleged inability to access law clerks.  *Id.*  Grievance Log No. 2006-29-20380 grieved an alleged loss of property following plaintiff's transfer to the hospital.  *Id.*  Grievance Log No. 2006-29-19424 also grieved an alleged loss of property.  *Id.*  Finally, Grievance Log No. 2006-29-19736 grieved an alleged violation of the Americans with Disabilities Act ("ADA").  *Id.*

Later that day, plaintiff filed a second informal grievance, claiming that NDOC officials were engaged in a conspiracy to "compromise and defraud the grievance procedure." *Id.* at 10-11. Plaintiff complained that he had still not received a response to his February 1, 2011, informal grievance, and that he believed it had been "destroyed to preempt charges against Rexwinkel and Corzine . . . [in] a conspiracy by NDOC to manipulate the rules of AR 740 . . .." *Id.* at 13. Plaintiff stated that to resolve this issue, he would need a copy of his original February 1, 2011, informal grievance and a response to that grievance. *Id.* at 14. On July 11, 2011, plaintiff's second informal grievance was rejected on the grounds that it was a "duplicate." *Id.* at 15. However, NDOC did attach a copy of plaintiff's February 1, 2011, original informal grievance to the rejection response. *Id.* at 15-20.

On June 3, 2011, plaintiff finally received a response to his February 1, 2011, informal grievance, which stated:

> I have reviewed the reports in regards to this incident and in fact find it disturbing that you were not placed into Administrative Segregation at that time and also served with a Notice of Charges. Consider yourself lucky since you did not receive either. Grievance denied.

*Id.* at 9, 16.

On June 5, 2011, plaintiff submitted a second first level grievance, disagreeing with the response to his February 1, 2011, informal grievance.[3] *Id.* at 21-25. On September 14, 2011, plaintiff received a response, which stated:

> You were informed by CCSIII Moyle to let her investigate the situation and she would notify you as soon as she spoke to all parties involved. You were then requested to appear at Full Classification which you refused to appear. You were then removed as the Barber but allowed to find other employment. After reviewing the case note made regarding the incident you should consider yourself lucky that you did not receive a notice of charges for your actions but instead allowed to find other

---

[3] Plaintiff stated that he wished this first level grievance to apply to Grievance Log No. 2006-29-17985, as well as Grievance Log No. 2006-29-18518 (#56-1, Ex. D, pp. 21, 25).

1

2
employment with no repercussions.  Your accusations lack merit and are unfounded.
Grievance denied.

3
*Id.* at 26.

4
Plaintiff did not submit any further grievances under Grievance Log No. 2006-29-17985.

5
*Grievance Log No. 2006-29-18518*

6

7
On February 23, 2011, plaintiff submitted an informal grievance claiming that he had been

8
"arrested" on false charges of threatening defendant Rexwinkel (#56-1, Ex. E, p. 1).  Plaintiff alleged

9
that the false charges were "obviously conspiratorically [sic] manufactured in order to retaliate

10
against me for filing a grievance on Rexwinkel for filing a fictitious report . . . on February 1, 2011."

11
*Id.* at 1-2.  Plaintiff alleged that the "present allegations that I made new threats against Rexwinkel

12
are absolute lies . . .," and stated that he was being unfairly held in the administrative segregation

13

14
unit pending an investigation.  *Id.* at 2-3.

15
On June 3, 2011, plaintiff's informal grievance was rejected on the grounds that:
Records show you already have a grievance regarding similar issue's [sic]

16
#20062917985 and attempts to continue and file grievance after grievance on the
same issue is not allowed and will not be accepted.

17

18
*Id.* at 4.   On June 5, 2011, plaintiff filed a first level grievance, which purported to cover both

19
Grievance Log No. 2006-29-17985 and Grievance Log No. 2006-29-18518.   On September 14,

20
2011, plaintiff received the response noted above under Grievance Log No. 2006-29-17985.

21

22
Plaintiff did not submit any further grievances under Grievance Log No. 2006-29-18518.

23
*Grievance Log No. 2006-29-26008*

24
On May 7, 2011, plaintiff submitted an informal grievance, claiming that he feared for his

25
life because defendant Rexwinkel had just been assigned to plaintiff's housing unit (#56-1, Ex. F,

26
pp. 1-5).  Plaintiff asserted that if defendant Rexwinkel remained in plaintiff's housing unit, she

27
would "exact further revenge and retaliation" upon plaintiff.  *Id.* at 3.  Plaintiff also asserted that his

28

1

2

"case" was still being investigated; thus, it would be a "conflict of interest" for defendant Rexwinkel

to have any "jurisdiction over any aspects of [plaintiff's] life and incarceration." *Id.* at 3-4.

3

4

On September 1, 2011, plaintiff received a response, which stated that defendant Rexwinkel

5

had simply been covering plaintiff's housing unit with another caseworker and that she was never

6

assigned to plaintiff. *Id.* at 1.  Plaintiff did not appeal this response to the first or second level of

7

review (#56-1, Ex. C, ¶ 12).

8

9

In addition to defendant Rexwinkel's assertion that plaintiff failed to exhaust his

10

administrative remedies, she also asserts that the court should grant her motion for summary

11

judgment on plaintiff's First Amendment retaliation claim.  Defendant contends that: (1) she could

12

not have retaliated against plaintiff for filing a lawsuit because she did not know that plaintiff had

13

filed a lawsuit when she fired him from his job (#56, p. 9); (2) plaintiff was fired from his job as a

14

barber because he was not performing his job assignments (#56, p. 10); (3) plaintiff was transferred

15

16

to a different housing unit due to his own poor behavior (#56, pp. 10-11); (4) there is no evidence

17

that any alleged retaliation chilled plaintiff's exercise of his protected First Amendment activity.  *Id.*

18

at 11.  Defendant Rexwinkel attaches several documents to support her unenumerated 12(b) motion

19

to dismiss, or in the alternative, motion for summary judgment, including: (1) the applicable version

20

of NDOC's Administrative Regulation ("AR") 740 (#56-1, Ex. B);[4] (2) the declaration of Monica

21

Navarro (#56-1, Ex. C); (3) plaintiff's Grievance Log No. 2006-29-17985 (#56-1, Ex. D);[5] (4)

22

plaintiff's Grievance Log No. 2006-29-18518 (#56-1, Ex. E);[6] (5) plaintiff's Grievance Log No.

23

24

2006-29-26008 (#56-1, Ex. F);[7] (6) the declaration of Julie Rexwinkel; (7) a NOTIS case note

25

26

27

28

---

[4] Authenticated by the declaration of Maxcine S. Blackwell (#56-1, Ex. A, ¶ 5).
[5] Authenticated by the declaration of Monica Navarro (#56-1, Ex. C, ¶¶ 8-9).
[6] Authenticated by the declaration of Monica Navarro (#56-1, Ex. C, ¶¶ 10-11).
[7] Authenticated by the declaration of Monica Navarro (#56-1, Ex. C, ¶¶ 12-13).

transcribed by defendant Rexwinkel on February 1, 2011 (#56-1, Ex. G, attachment);[8] and (8)

NNCC's completed grievance report from February 1, 2011, to August 16, 2011 (#72-1, Ex. A).[9]

Plaintiff opposes defendant's motion and moves for summary judgment on the grounds that:
(1) plaintiff could not submit the required succession of grievances while housed in administrative
segregation because NNCC staff refused to provide him with grievance forms (#71, p. 3); (2)
plaintiff was forced to rely on the few informal and first level grievance forms he maintained in his
legal property (#71, p. 6); (3) the PLRA states that if NDOC prison officials prevent an inmate from
completing the grievance process, the inmate is not required to exhaust administrative remedies
before filing an action in federal court (#71, p. 7); and (4) plaintiff "is convinced that Rexwinkle's
[sic] false accusations against him are due to plaintiff's filing this original 1983 complaint which
named nearly 20 staff members of NDOC as defendants . . .." (#71, p. 10).

Defendant Rexwinkel replies that: (1) plaintiff's claim that NNCC staff members are
engaged in a conspiracy to withhold second level grievance forms has no merit, as NDOC business
records reveal that between February 1, 2011, and August 16, 2011 (the submission of plaintiff's
first amended civil rights complaint), seventy-two second level grievances were filed by NNCC
inmates (#72, p. 2); (2) although plaintiff filed grievances complaining of untimely responses,
plaintiff never complained that NNCC staff withheld second level grievance forms (#72, p. 2); (3)
late responses do not relieve an inmate of his obligation to complete the grievance process (#72, p.
2); (4) plaintiff cannot establish a link between defendant Rexwinkel's alleged retaliation and
plaintiff's First Amendment activity, as on February 1, 2011, the court had not screened plaintiff's
original complaint, no defendants had been served, and defendant Rexwinkel was unaware of the

---

[8] Authenticated by the declaration of Julie Rexwinkel (#56-1, Ex. G, ¶ 5).
[9] Authenticated by the declaration of Scott Howard (#72-1, Ex. A, ¶7).

litigation (#72, p. 4); and (5) plaintiff fails to set forth any evidence that defendant Rexwinkel's

alleged retaliation chilled the exercise of his First Amendment activity (#72, p. 4).

Plaintiff responds that: (1) all NNCC staff made conscious efforts to deny plaintiff grievance

forms (#73, p. 3); (2) the PLRA states that if NDOC prison officials prevent an inmate from

completing the grievance process, he is permitted to file an action in federal court (#73, p. 4); and (3)

defendant's reliance on a report detailing the number of second level grievances filed by other

inmates fails to consider plaintiff's status as a "targeted prisoner" who was accused of threatening a

female staff member, or his placement in "solitary confinement" where he had no access to

caseworkers, the law library, or other inmates who could have supplied him with the necessary

forms (#73, p. 4).

As a preliminary matter, the court notes that plaintiff is proceeding *pro se*.  "In civil cases

where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford

plaintiff the benefit of any doubt."  *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623

(9th Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

## II.  DISCUSSION & ANALYSIS

**A.     Legal Standards**

**1.  42 U.S.C. § 1983**

 Title 42 U.S.C. § 1983 "provides a federal cause of action against any person who, acting

under color of state law, deprives another of his federal rights."  *Conn v. Gabbert,* 526 U.S. 286, 290

(1999).  Section 1983 does not offer any substantive rights, but provides procedural protections for

federal rights granted elsewhere.  *Albright v. Oliver,* 510 U.S. 266, 271 (1994).  To prove liability

under § 1983, a plaintiff must: (1) show that a person acting under color of state law engaged in

some type of conduct, which (2) deprived the plaintiff of some right, privilege or immunity secured

by the Constitution or federal statutory law.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overturned on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).

**B.      Analysis**

**1.   Defendant's Unenumerated 12(b) Motion to Dismiss**

Defendant Rexwinkel asks the court to dismiss plaintiff's first amended civil rights complaint on the grounds that plaintiff failed to properly exhaust his administrative remedies with respect to his First Amendment retaliation claim—the only remaining claim in this litigation (#56, p. 2).

**a.   Exhaustion**

Failure to exhaust administrative remedies is an affirmative defense under the Prison Litigation Reform Act ("PLRA"), and the defendant bears the burden of proving that the plaintiff has not exhausted his administrative remedies.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Wyatt v. Terhune*, 315 F.3d 1108, 1117 n.9 (9th Cir. 2003), *cert. denied*, 540 U.S. 810 (2003).  Inmates are not required to specifically plead or demonstrate exhaustion in their complaints; rather, it is the defendant's responsibility to raise the issue in a responsive pleading.  *Jones*, 549 U.S. at 216.

Failure to exhaust is treated as a matter in abatement, not going to the merits of the claim, and is properly raised in an unenumerated Rule 12(b) motion.  *Wyatt*, 315 F.3d at 1119.  If the court ultimately finds that the plaintiff has not exhausted his nonjudicial remedies, the court should dismiss his claims without prejudice.  *Wyatt*, 315 F.3d at 1119-20, *as noted in O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1059 (9th Cir. 2007); *see also Ritza v. Int'l Longshoremen's & Warehousemen's Union*, 837 F.2d 365, 368 n.3 (9th Cir. 1988).

**i.   Prison Litigation Reform Act of 1996**

The PLRA amended 42 U.S.C. § 1997e to provide that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner

confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

Although once within the discretion of the district court, the exhaustion requirement is now mandatory. *Porter v. Nussle*, 534 U.S. 516, 524 (2002) (citation omitted). Administrative remedies "need not meet federal standards, nor must they be 'plain, speedy, and effective.'" *Porter*, 534 U.S. at 524 (citing *Booth v. C.O. Churner*, 532 U.S. 731, 740 n.5 (2001)). Even when the prisoner seeks remedies that are not available in administrative proceedings—notably money damages—exhaustion is still required prior to filing suit. *Booth*, 532 U.S. at 741. Recent case law demonstrates that the Supreme Court has strictly construed section 1997e(a). *Id.* at 741 n.6 ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise.").

The Supreme Court has clarified that exhaustion cannot be satisfied by filing an untimely or otherwise procedurally infirm grievance; rather the PLRA requires "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). "Proper exhaustion" means that the prisoner must use "all steps the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Id.* (citation omitted) (emphasis in original). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudication system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91.

### ii. NDOC Procedures

"[A]pplicable procedural rules [for proper exhaustion] are defined not by the PLRA, but by the prison grievance process itself." *Jones*, 549 U.S. at 218. NDOC's grievance procedure is governed by AR 740, which defendant has attached to her motion (#56-1, Ex. B). AR 740 provides that an inmate may use the grievance procedure to "resolve addressable inmate claims including . . . personal property, property damage, disciplinary appeals, personal injuries, any other tort claim or

civil rights claim relating to conditions of institutional life." *Id.* at 2.  NDOC's grievance process has

three levels of review: (1) an informal level grievance, which "should be reviewed, investigated and

responded to by the inmate's assigned Caseworker" in consultation with other appropriate staff; (2) a

first level formal grievance, which "should be reviewed, investigated and responded to by the

Warden;" and (3) a second level formal grievance, which "should be reviewed and responded to" by

either the appropriate Deputy Director, the Offender Management Administrator, or the Medical

Director.  *Id.* at 4, 6-7.

Once an inmate submits an informal grievance, NDOC logs the grievance into a tracking

system.  *Id.* at 2-3.  The caseworker assigned to the grievance will provide the inmate with a

response within forty-five days, unless additional time is needed to conduct further investigation.  *Id.*

at 6.  If the inmate is not satisfied by the caseworker's response, he may appeal the decision within

five days by filing a first level formal grievance.[10]  *Id*.  The Warden will provide the inmate with a

response within forty-five days.  *Id.* at 16.  If the inmate is not satisfied with the Warden's response,

he may appeal the decision within five days by filing a second level formal grievance.  *Id.* at 7.  The

appropriate NDOC official will provide the inmate with a response within sixty days.  *Id*.

If an inmate's grievance does not comply with procedural guidelines, the grievance is

returned to the inmate with instructions for proper filing.  *Id.* at 6.  Upon completion of the grievance

process, an inmate may pursue civil rights litigation in federal court.

### iii.   Plaintiff's Grievance Logs

For an inmate to satisfy the PLRA's exhaustion requirement, "proper exhaustion of

administrative remedies is necessary."  *Woodford*, 548 U.S. at 84.  This requires an inmate to

comply with the agency's deadlines and "other critical procedural rules . . .."  *Id.* at 90.  AR 740

---

[10] At the informal level of review, if the caseworker's response is overdue, the inmate may proceed to the next level.  *Id.* at 3.

states that an inmate must complete the three-level grievance procedure in order to properly exhaust his administrative remedies (#56-1, Ex. B, pp. 4, 6-7).  Based on the court's review of plaintiff's grievance history, plaintiff failed to properly exhaust his First Amendment retaliation claim.

Plaintiff failed to submit a second level formal grievance for any of the three Grievance Log Numbers which were relevant to plaintiff's First Amendment retaliation claim.  Accordingly, none of these three grievances satisfy the PLRA's exhaustion requirement.  Despite its somewhat constrained procedural history, the court finds that in Grievance Log No. 2006-29-17985, plaintiff submitted two informal grievances and two first level grievances.  However, he did not appeal the denial of either of his first level grievances to the second level of review.  In Grievance Log No. 2006-29-18518, plaintiff submitted an informal grievance (which was rejected) and a first level grievance.  Plaintiff did not appeal the denial of his first level grievance to the second level of review.  Finally, in Grievance Log No. 2006-29-26008, plaintiff merely submitted an informal grievance, and did not appeal its denial to the first level of review.

Plaintiff does not dispute that he never appealed any of these grievances to the second level of review.  Instead, plaintiff asserts that he could not submit the required succession of grievances because he was housed in administrative segregation, where NNCC prison officials refused to provide him with the necessary grievance forms (#71, pp. 3, 6).  Thus, plaintiff contends he was forced to rely on the few informal and first level grievance forms he maintained in his legal property in order to submit his complaints.  *Id.*

Under the PLRA, as amended, prisoners must exhaust "such administrative remedies as are *available*" prior to filing suit in federal court challenging prison conditions.  42 U.S.C. § 1997(e)(a) (italics added).  A prisoner's failure to exhaust may be excused if he can demonstrate that the grievance process is unavailable to him because: (1) administrative procedures are unavailable (for

example, if he is unable to obtain the requisite forms); (2) prison officials obstructed his attempts to

exhaust; or (3) prison officials failed to follow procedures for processing grievances. *Nunez v.*

*Duncan*, 591 F.3d 1217, 1224 (9th Cir. 2010). Further, an administrative remedy is not considered

to have been available if a prisoner, through no fault of his own, was prevented from availing

himself of it. *Id.* To be available, "a remedy must be capable of use for the accomplishment of its

purpose." *Id.* at 1224 (citing *Turner v. Burnside*, 541 F.3d 1077, 1084 (11th Cir. 2008).

The record indicates that after plaintiff was transferred to the administrative segregation unit

on February 17, 2011, he filed several grievances related to defendant Rexwinkel's alleged

retaliation. In these grievances, plaintiff complained about NNCC's delay in responding to his

February 1, 2011, informal grievance (#56-1, Ex. D, pp. 5-7, 10-14, 21-25), and complained about

his transfer to the administrative segregation unit on false charges that he had made new threats

against defendant Rexwinkel (#56-1, Ex. E, pp. 1-3). In these grievances, plaintiff did not mention

the deficit of grievance forms or allege that correctional officers assigned to the administrative

segregation unit withheld these forms. Plaintiff also did not attempt to file a second level formal

grievance by using a different form (such as by crossing out the words "First Level Grievance" and

writing "Second Level Grievance" in their place). Accordingly, the court finds that plaintiff's

contention that NNCC officials prevented him from completing the grievance process is not

supported by the record. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir.

2002) ("[u]ncorroborated and self-serving testimony" without more, will not create a genuine issue

of material fact precluding summary judgment). Plaintiff has not demonstrated that the grievance

process was made unavailable to him, for purposes of the PLRA, by the actions of NNCC staff.

In addition, although NNCC prison officials provided late responses to several of plaintiff's

grievances, late responses do not relieve inmates of their obligations under the PLRA. *See*

*Woodford*, 548 U.S. at 84 (proper exhaustion of administrative remedies is required).  If a response is overdue at the informal level of review, an inmate has the option of either waiting for that response or proceeding to the first level of review without the overdue response (#56-1, Ex. B, p. 3). Although plaintiff's February 1, 2011, informal grievance was long overdue, plaintiff still had to progress through the grievance levels in order to exhaust his administrative remedies.

The court finds that plaintiff failed to properly exhaust his administrative remedies with respect to his First Amendment retaliation claim.  Further, plaintiff's First Amendment retaliation claim fails as a matter of law.

## 2.   Defendant Rexwinkel's Motion for Summary Judgment

### a.   Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where there are no factual disputes.  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court will grant summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  The court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party.  *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  However, the Supreme Court has noted:

> [W]e must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citations omitted).  Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting authenticated evidence to demonstrate the absence of any genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see Orr v. Bank of America*, 285 F.3d 764, 773-74 (9th Cir. 2002). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. *Anderson*, 477 U.S. at 248. Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and upon which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322-23.

On summary judgment the court is not to weigh the evidence or determine the truth of the matters asserted, but must only determine whether there is a genuine issue of material fact that must be resolved by trial. *See Summers v. A. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th Cir. 1997). Nonetheless, in order for any factual dispute to be genuine, there must be enough doubt for a reasonable trier of fact to find for the plaintiff in order to defeat a defendant's summary judgment motion. *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

### b.  First Amendment Retaliation

Defendant Rexwinkel asserts that she is entitled to summary judgment on plaintiff's First Amendment retaliation claim because there is no evidence establishing a link between defendant's alleged retaliation, i.e., dismissing plaintiff from his job as a barber, and plaintiff's exercise of his First Amendment rights, i.e., filing the original complaint in this case (#56, p. 11). Defendant Rexwinkel also asserts that there is no evidence that any alleged retaliation chilled plaintiff's exercise his First Amendment activity. *Id.*

1

2

3

4

5

6

7

8

9

10

"A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmates exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Federal courts were not created to supervise prisons, but to enforce the constitutional rights of all persons, including prisoners.  "We are not unmindful that prison officials must be accorded latitude in the administration of prison affairs, and that prisoners necessarily are subject to appropriate rules and regulations." *Cruz v. Beto*, 405 U.S. 319, 321 (1982).  But prisoners, like other individuals, have the right to petition the government for redress of grievances, which includes the First Amendment right to file grievances against prison officials and to be free from retaliation for doing so.  *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009).  "Of fundamental import to prisoners are their First Amendment 'rights to file prison grievances . . ..'" *Rhodes*, 408 F.3d at 567 (quoting *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003)).  "[B]ecause purely retaliatory actions taken against a prisoner for having exercised those rights necessarily undermine those protections, such actions violate the Constitution quite apart from any underlying misconduct they are designed to shield." *Rhodes,* 408 F.3d at 567.

25

26

27

Defendant Rexwinkel alleges that on February 1, 2011, she received inmate complaints that plaintiff, who was the assigned barber, was not cutting hair (#56-1, Ex. G, ¶ 4).[11]   Defendant

28

---

[11] Defendant Rexwinkel was the caseworker assigned to plaintiff's housing unit. *Id.*

1    Rexwinkel verified the inmates' reports by speaking with a senior correctional officer and custody

2    staff.  *Id.*   She then called plaintiff into her office and terminated his employment.  *Id.* at ¶ 5.

3    Defendant Rexwinkel alleges that plaintiff became angry and raised his voice.  She told plaintiff to

4    lower his voice several times.  *Id.*  Defendant Rexwinkel alleges that plaintiff then leaned over her

5    desk, pointed his finger at her, and demanded to know "what the hell is going on."  *Id.*  Plaintiff then

6    stated that he believed he was being fired in retaliation for a lawsuit that he had recently filed against

7    the state.  *Id.*   Based on plaintiff's behavior, defendant Rexwinkel ordered plaintiff to leave her

8    office.  When he left, defendant Rexwinkel locked the office door and summoned custody staff.  *Id.*

9    She then documented the incident in NOTIS.  *Id.*

10        Defendant Rexwinkel declared that prior to February 1, 2011, she was unaware that plaintiff

11   was engaged in any litigation.  *Id.* at ¶ 6.  She also declared that the first time she heard that plaintiff

12

13   was engaged in any litigation was on February 1, 2011, when plaintiff informed her that he believed

14   he was being fired for filing a lawsuit against the state.  *Id.*  Defendant Rexwinkel declared that she

15   was not aware that plaintiff had sued her personally until September 2011, when the NDOC accepted

16

17   service of a summons and plaintiff's first amended civil rights complaint on her behalf.  *Id.* at ¶ 7.

18        Defendant Rexwinkel alleged that plaintiff was fired from his job due to his poor job

19

20   performance—not in retaliation for filing a lawsuit.  *Id.* at ¶ 8.  Defendant Rexwinkel also alleged

21   that plaintiff was transferred to a different housing unit due to his behavior in her office on February

22   1, 2011, when plaintiff raised his voice and acted in a threatening manner—not in retaliation for

23

24   filing a lawsuit.  *Id.* at ¶ 9.

25        Defendant Rexwinkel attached an authenticated copy of the NOTIS case note she prepared

26   after the incident on February 1, 2011.  The case note states:

27

28        Terminated this date from barber position.  Reports rec'd from U4 custody that
          inmate never leaves cell and does not work.  Custody staff verified with other unit

-17-

1
2
3
4
5
6
7

officers that the inmate has not been working in the yard units.  Inmate summoned to CCS staff office to discuss.  Was going to give inmate option of finding another job but offer rescinded due to actions of inmate.  When he entered the office he came over the desk pointing index finger at me claiming he wanted to know "what the hell is going on."  He had a raised voice which he was told several times to lower.  Due to his behavior he was told to leave the office and door was locked and custody staff summoned.  Inmate claimed he knew the reason why—that his lawsuit against the state went thru yesterday and that he was going to grieve me.  [T]old to get a grievance from unit staff.  [E]scorted from office by custody and told to return to unit 4 to pack and he was moving this date.  Behavior of this nature will not be tolerated. Inmate was fortunate to not be taken back to unit 7A as ad-seg.  No OIC forthcoming.

8
9

Although plaintiff asserts that he "is convinced that Rexwinkle's [sic] false accusations

10

against him are due to plaintiff's [sic] filing this original 1983 complaint which named nearly 20

11

staff members of NDOC as defendants…," the court notes that "[u]ncorroborated and self-serving

12

testimony" without more, will not create a genuine issue of material fact precluding summary

13

judgment.  *See Villiarimo*, 281 F.3d at 1061.

14

Plaintiff's original civil rights complaint was filed on January 28, 2011 (#1).  At that time,

15

none of the defendants were served with the complaint, as it had not yet been screened by the court.

16

The court screened the complaint on April 7, 2011, and dismissed all claims (#9).   Plaintiff

17
18

submitted his first amended civil rights complaint on August 16, 2011, and it was screened and filed

19

on August 25, 2011 (#24; #25).  No defendant was put on notice of the first amended civil rights

20
21

complaint through the litigation process until the complaint survived screening and was directed to

22

the Attorney General's Office (#24).  Defendant Rexwinkel declared that she had no knowledge that

23

plaintiff was engaged in any litigation until after she fired him from his barber job on February 1,

24

2011 (#56-1, Ex. G, ¶ 6).

25

The court finds that plaintiff has failed to set forth any evidence indicating a link between

26
27

defendant Rexwinkel's action in firing plaintiff from his barber job and plaintiff's filing of his

28

original civil rights complaint.  In addition, plaintiff has failed to even allege facts supporting a

necessary element of his First Amendment retaliation claim; that is, that defendant's alleged retaliation chilled the exercise of his First Amendment rights.  The court notes that plaintiff filed numerous grievances after the alleged retaliation occurred on February 1, 2011, and has vigorously pursued the current action.[12]  Finally, plaintiff's termination from his barber job, and subsequent transfer to a different housing unit, appear to have been done for legitimate penological purposes. Defendant Rexwinkel declared that she fired plaintiff because inmates, a senior correctional officer, and custody staff all reported that plaintiff was not performing his job duties—not in retaliation for plaintiff exercising his First Amendment rights (#56-1, Ex. G, ¶¶ 5-6).  Defendant Rexwinkel also declared that she transferred plaintiff to a different housing unit due to plaintiff's inappropriate behavior, which could "not be tolerated"—not in retaliation for plaintiff exercising his First Amendment rights (#56-1, Ex. G, attachment).

The court finds that there is no evidence linking defendant's alleged retaliation with plaintiff's exercise of his First Amendment rights; no evidence that defendant's alleged retaliation chilled the exercise of plaintiff's First Amendment rights; and no evidence that defendant Rexwinkel's actions did not support a legitimate penological interest.  Accordingly, the court recommends that defendant's motion for summary judgment regarding plaintiff's First Amendment retaliation claim (#56) be granted, and that plaintiff's motion for summary judgment regarding his First Amendment retaliation claim (#55) be denied.

### III.  CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes that defendant Rexwinkel is entitled to summary judgment in her favor as to plaintiff's First Amendment retaliation claim, as there are no genuine issues of material fact for trial.  The parties are advised:

---

[12] Between the dismissal of plaintiff's original civil rights complaint and the filing of his first amended civil rights complaint, plaintiff filed multiple motions and an appeal with the Ninth Circuit (#5- #23).

1.        Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this Report and Recommendation within fourteen days of receipt.  These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.        This Report and Recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## IV.    RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that defendant's unenumerated 12(b) motion to dismiss and/or motion for summary judgment (#56) be **GRANTED** and that plaintiff's motion for summary judgment (#55) be **DENIED**.


**DATED:** May 6, 2013.

_____
**UNITED STATES MAGISTRATE JUDGE**

-20-